**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**UNITED STATES OF AMERICA**

**v.**

**GODFREY ILONZO, BONA
ILONZO, DR. WILLIAM
RICHARDSON, DR. NEVORN
ASKARI, ROSEMARY OFUME,
and DONATUS IRIELE**

**Defendants.**

**CRIMINAL FILE NO.**

**1:12-CR-276-SCJ-GGB**

**Magistrate Judge Gerrilyn G. Brill**

## REPORT AND RECOMMENDATION

The second superseding indictment [Doc. 146] charges defendants with conspiracy to illegally distribute prescriptions for controlled substances without a legitimate medical purpose and related offenses.  This Report and Recommendation addresses the following motions:

(1)    Godfrey Ilonzo's Motion to Suppress Telephone Conversations Between an Attorney and His Client [Doc. 31];

(2)    Godfrey Ilonzo's Motion to Suppress Statements [Doc. 32];

(3)    Godfrey Ilonzo's Motion to Suppress Evidence [Doc. 108], adopted by Bona Ilonzo [Doc. 116];

(4)     Godfrey Ilonzo's Motion to Suppress Evidence Seized from Rental Car [Doc. 109];

(5)     Bona Ilonzo's First Motion to Suppress Evidence from Computer and Personal Property [Doc. 113], adopted by Godfrey Ilonzo [Doc. 137];

(6)     William Richardson's Preliminary Motion to Suppress Computer Evidence [Doc. 110] and Perfected Motion to Suppress Evidence [Doc. 261];

(7)     Nevorn Askari's Motion to Sever [Doc. 123];

(8)     Donatus Iriele's Motions to Suppress Evidence and Statements [Docs. 210, 211, 239, 262], adopted by Rosemary Ofume [Docs. 213, 214, 268, 269]; and

(9)     Rosemary Ofume's and Donatus Iriele's Motions to Suppress Statements of Defendant [Docs. 240, 242].

Hearings on these motions were held before me on November 20, 2013 [Doc. 219][1] and December 2, 2014 [Doc. 285].

---

[1] Defendants Iriele and Ofume were given the option of appearing at the evidentiary hearing on November 20, 2013, or relying on the transcript developed by the attorneys for the other defendants on the issue of the government delay in searching the computers that were seized on August 22 and 23, 2012. (Doc. 215). Iriele and Ofume chose not to appear and relied on the transcript for purposes of their arguments on delay in searching the computers. An additional hearing on other issues raised in

# I.    **FACTS**

In August 2012, the Drug Enforcement Administration ("DEA") was conducting an investigation of a group of clinics operating under the name "AMARC," owned by husband and wife Godfrey Ilonzo ("Mr. Ilonzo") and Bona Ilonzo ("Ms. Ilonzo"), and the Medicine Center Pharmacy ("MCP"), owned by husband and wife Donatus Iriele ("Iriele") and Rosemary Ofume ("Ofume").  (Doc. 219 at 206).  The investigation centered on the clinics' illegal prescribing of Oxycodone and other controlled substances and the pharmacy's illegal dispensing of those controlled substances.  (Id. at 81, 234-35).

On August 21, 2012, the FBI obtained an arrest warrant on a complaint against Mr. Ilonzo for bankruptcy fraud.  (Docs. 1, 21; Doc. 219 at 33-36).  On August 22, 2012, United States Magistrate Judge Russell G. Vineyard issued federal search warrants for six locations: three AMARC clinics (including the clinic located at 1755 Lakewood Avenue, Atlanta, Georgia (hereinafter, the "AMARC-Lakewood clinic") and the clinic located at 1135 Senoia Road, Tyrone, Georgia (hereinafter the "AMARC-Tyrone clinic")); Medicine Center Pharmacy; the residence of Ms. Ilonzo and Mr. Ilonzo at 60 Gladwyne Ridge Drive, Alpharetta, Georgia (hereinafter, the

the Motions to Suppress filed by Iriele and Ofume was held on December 2, 2014.  [Doc. 285].

"Ilonzo Residence"); and the residence of Ofume and Iriele at 3789 Brookside Parkway, Decatur, Georgia (hereinafter, the "Ofume/Iriele Residence").  (Gov. Ex. 6; Doc. 219 at 205-06).  On August 23, 2012, Magistrate Judge Vineyard issued additional search warrants for the Ilonzo and Ofume/Iriele residences authorizing the search and seizure of three computers located during the August 22, 2012 searches of those residences.  (Doc. 219 at 211-13).

The affidavits for all of the August 22 search warrants were the same, with DEA Special Agent Jeffrey Diller as the affiant.  (See Gov. Ex. 6).  SA Diller's affidavit detailed a three-year investigation and was eighty-seven pages long. (See id.).  Among the facts included in the affidavit (or that can be inferred from the affidavit) were the following:

Mr. and Ms. Ilonzo were the principals of the clinics.  (Gov. Ex. 6 ¶ 18).  Ms. Ilonzo incorporated AMARC in 1999.  (Id.).  Agents conducting surveillance of the AMARC-Lakewood clinic from the fall of 2009 through July 2012 observed characteristics of illegal pain clinics including high patient volume, groups of patients arriving together, patients lined up outside before the clinic opened, and vehicles with out-of-country and out-of-state license plates.  (Gov. Ex. 6 ¶ 25).

4

Ms. Ilonzo was very involved with the operations of the clinics.  She gave out prescriptions for controlled substances to patients that had been pre-signed by a doctor who was not present at the clinic, and who had not seen the patients on the dates the prescriptions were issued.  (Gov. Exh. 6 ¶ 32).  When a doctor discharged a patient from one clinic, Ms. Ilonzo would direct the staff to transfer the patient to another AMARC clinic without informing the doctor.  (Id. ¶ 33).  She directed a patient to fill the patient's AMARC prescriptions at the MCP.  (Id. ¶ 179).  Ms. Ilonzo placed cash paid by the patients into her own pockets or purse.  (Id. ¶¶ 88, 162).  The Ilonzo residence had various documents related to the operations of the AMARC clinics.  (Id. ¶¶ 166-173).

Dr. William Richardson worked at three of the AMARC clinics—AMARC-Tyrone, AMARC-Lakewood, and AMARC-Edgewood.  (Gov. Exh. 6 ¶ 20).  Dr. Richardson worked at the AMARC clinics during the period of time that the AMARC Edgewood and Lakewood clinics would refer patients seeking pain management for a fee to one of the other AMARC pain clinics.  (Id. ¶¶ 78-85, 100-02).  The affidavit describes in great detail several undercover visits with Dr. Richardson by law enforcement agents posing as patients.  (Id. ¶¶ 93-94, 109-115).  In the opinion of a pain management expert, Dr. Richardson prescribed excessive

quantities of controlled substances in multiple undercover visits without a legitimate medical purpose and outside the course of professional practice.  (Id.).

A source of information ("SOI") informed law enforcement that Dr. Richardson had said that Mr. Ilonzo temporarily shut down the AMARC-Lakewood clinic in June 2012 because there was "too much heat" on the clinic.  (Id. ¶ 78). According to a confidential source, an AMARC employee stated that AMARC physicians would travel daily to the AMARC-Lakewood clinic to pick up patient medical files, transport them to the AMARC-Tyrone clinic where the patient was seen, and then transfer the files back to AMARC-Lakewood at the end of the day. (Id. ¶ 81).

SA Diller's affidavit set forth the following information about searching computers and other electronic devices:

- "Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice," (Gov. Ex. 6 ¶ 5(q));

- People often maintain "personal financial records" including banking records in their home either in "traditional hard copy form or on an electronic device," (Id. ¶ 5(x)(vi));

- "[S]earching and seizing information from computers often requires agents to seize most or all electronic storage devices . . . to be searched later by a qualified computer examiner in a laboratory or other controlled environment" because the "volume of evidence" stored on computers requires search authorities to determine which files are evidence in a "sorting process [that] can take weeks or months, depending on the volume of data stored, and the method in which it is stored," making it "impractical to attempt this kind of search on site," (Id. ¶ 6);

- Searching "residue areas of computer storage devices can prove to be time consuming and require analytical methods and techniques which are best performed in a laboratory or other controlled environment," (Id. ¶ 6(c));

- "[S]earching computerized information for evidence and instrumentalities o[f] crime commonly requires agents to seize" peripheral devices of a computer system, (Id. ¶ 7); and,

- "The government does wish to seize (or retain) the hardware … in order to properly search the contents of those devices.  Every effort will be made to obtain the information contained in the hardware … at the time of the search.  Items will be seized only if computer experts participating in the search determine that necessary data cannot be obtained during the service of the warrant due to any of the aforementioned constraints," (Id. ¶ 7(b));

The warrant for the AMARC-Lakewood clinic defined the premises to be searched as the "AMARC-Lakewood Clinic . . . as described more fully in Exhibit A-1."  (Gov. Ex. 6 at SW-00000001).  Exhibit A-1 described the premises as "including electronic storage devices found therein."  (Gov. Ex. 6 at SW-00000003).  The warrant then stated that certain "property" as set forth in Exhibit B-1 was concealed on the "premises" and constituted evidence of federal drug trafficking and money laundering crimes.  (Gov. Ex. 6 at SW-00000001).  Exhibit B-1 listed items to be seized, including "[c]omputer-generated documents," and computers and other electronic devices "used to facilitate the business."  (Gov. Ex. 6 at SW-00000004-06) Judge Vineyard authorized officers to search and seize the property listed in Exhibit B-1.  (Gov. Ex. 6 at SW-00000001).

Georgia Bureau of Investigation (GBI) Special Agent/DEA Task Force Officer Kelly Aldrich was the evidence custodian during the search of the AMARC-Lakewood clinic.  (Doc. 219 at 105).

Seizure of Ms. Ilonzo's computer at the AMARC-Lakewood clinic

Prior to executing the search warrant at the clinics, officers met and discussed what could be seized pursuant to the warrant.  (Doc. 219 at 106-07, 116-17, 164). SA Aldrich knew that the search warrant authorized seizure of any computers "used to facilitate the business."  (Id. at 131).

With regard to Ms. Ilonzo's role, agents on the case (including SA Aldrich) learned that Ms. Ilonzo was a corporate officer and one of the principals of the AMARC clinics, profited from the clinics, and was usually present at the AMARC-Lakewood clinic when surveillance was conducted there.  (Doc. 219 at 148-49, 166-67, 199-200).  She was in charge of the day-to-day operations of the AMARC-Lakewood clinic, made sure that the patients were being seen, and collected and deposited the cash that was received from the patients.  (Id. at 111, 113, 141-43, 149).  DEA Task Force Officer (TFO) William Manning testified that on the day the search warrant was executed, August 22, he asked the employees at the

9

AMARC-Lakewood clinic, "Who is in charge here?" and the employees looked at Ms. Ilonzo.  (Id. at 199).

On the day of the search, SA Aldrich entered the front office of the AMARC-Lakewood clinic.  (Doc. 219 at 107).  In that office she observed at least three desks, a desktop computer, and various patient files and business records.  (Id. at 108-09, 134).  SA Aldrich also observed a purse and laptop bag located on or next to one of the desks.  (Id. at 108-109).  Other officers told SA Aldrich that Ms. Ilonzo had been standing at that desk when the search warrant team first entered the clinic. (Id. at 109, 134-35, 169).  There were other items on that desk, including a cell phone, bank deposit slips and a day planner (open on top of the desk) showing multiple patient-related entries as well as an envelope containing approximately $6,000 in cash.  (Id. at 109-110, 113; 139-40, 170).  SA Aldrich believed that Ms. Ilonzo used that desk to conduct the business of the clinic.  (Id. at 112).

SA Aldrich searched the purse and laptop bag.  (Doc. 219 at 111-112).  Inside the laptop bag, SA Aldrich located a MacBook Pro laptop computer, a notebook containing records relating to the AMARC business, and a manila folder containing deposit receipts and other records from a bank where SA Aldrich knew that the AMARC clinic maintained a business account.  (Id. at 112, 138-39, 143-44, 153).

Ms. Ilonzo confirmed to SA Aldrich that the purse and laptop bag belonged to her. (Id. at 114).  SA Aldrich seized Ms. Ilonzo's laptop computer.  (Id. at 107).

### Seizure of Dr. Richardson's computer at the AMARC-Lakewood clinic

During the investigation, Dr. Richardson  was the only doctor who worked at the AMARC-Lakewood clinic, but he also worked at other AMARC clinics.  (Doc. 219 at 123).  None of the agents ever saw Dr. Richardson using his personal computer at the clinic.  (Id. at 131).  In particular, during visits with law enforcement officers posing as patients, Dr. Richardson did not use his computer.  (Id. at 132).

TFO Manning had extensive experience in the investigation of the illegal prescribing of controlled substances at illegitimate pain clinics known as "pill mills." (Doc. 219 at 160-61).  Every "pill mill" that he had investigated had used computers in some way to facilitate its illegal business, such as for billing or to generate prescriptions.  (Id. at 162-63).  TFO Manning knew from his prior investigations that physicians at "pill mills" (as well as legitimate physicians) used computers to facilitate the business of the clinics at which they worked.  (Id. at 163).  TFO Manning knew that AMARC (like other illegitimate pain clinics) paid its physicians (including Dr. Richardson) in money orders.  TFO Manning believed that illegitimate clinics used money orders to avoid having records of what they paid their doctors.

(Id. at 165-66).  One of the goals of the investigation was to track the income that was generated by the AMARC pain clinics. (Id. at 132, 164-66).

During the search of the AMARC-Lakewood clinic, TFO Manning searched a room that had a sign identifying it as a "Doctor's Lounge."  (Doc. 219 at 171).  No other room at the AMARC-Lakewood clinic appeared to be used as a doctor's office or lounge.  (Id. at 171-72).  TFO Manning found in that room a Dell laptop computer belonging to Dr. Richardson.  (Id. at 149-50).  The laptop was located inside a laptop bag (that also contained documents associated with one of Dr. Richardson's other businesses) sitting either on the desk or a chair in the room.  (Id. at 149-50, 171).  TFO Manning seized the laptop computer but did not seize the other documents that were inside the laptop bag.  (Id. at 172-73, 185, 190).

Neither TFO Manning nor any other officer involved with the search knew whether Dr. Richardson used his personal computer to access patient files.  (Doc. 219 at 132).  However, TFO Manning knew that Dr. Richardson had worked at several AMARC locations where he had been seen bringing bags from his vehicle into the clinics.  (Id. at 173-74, 179).  SA Aldrich also knew that Dr. Richardson worked at multiple AMARC clinics and saw some patients at more than one AMARC clinic.

12

(Id. at 132-33).  TFO Manning seized Dr. Richardson's laptop computer.  (Id. at 173-74).

Other than the computers belonging to Ms. Ilonzo and Dr. Richardson, agents seized no other computers or other electronic devices from any patients or other employees during the execution of the search warrant at the AMARC-Lakewood clinic on August 22.  (Doc. 219 at 115, 145, 175).  Nor did officers seize any cell phones (including the cell phone belonging to Ms. Ilonzo) during the execution of the search warrant at the AMARC-Lakewood clinic. (Id. at 169).

Search at the AMARC-Tyrone clinic; Arrest and Statements of Mr. Ilonzo

At approximately 3:00 p.m. on Wednesday August 22, 2012, ten to fifteen law enforcement agents entered the AMARC-Tyrone clinic.  (Doc. 219 at 35, 36, 51, 60, 62).  The officers had their guns drawn and some were wearing masks.  (Id. at 49-50).  They were shouting commands at the patients and staff.  (Id. at 50).  Some of the agents located Godfrey Ilonzo in his office at the clinic.  Mr. Ilonzo appeared to be in a state of shock, but not in a great deal of distress.  Agents arrested him pursuant to the warrant for bankruptcy fraud and handcuffed him.  (Id. at 37-39, 53).

FBI Special Agent Steven Dunn entered Mr. Ilonzo's office after he was arrested, identified himself to Ilonzo, and told him that he was being arrested on

bankruptcy fraud charges.  (Doc. 219 at 40-41).  SA Dunn told Mr. Ilonzo that the agents would like the opportunity to ask Ilonzo some questions if he was willing to talk with them.  (Id. at 41).  SA Dunn presented Mr. Ilonzo with the standard FBI Advice of Rights form and asked if he would give consent to speak with the agents and sign the form. (Id. at 42).  The form contained the standard Miranda warnings. (Gov. Ex. 4).  SA Dunn orally explained to Mr. Ilonzo that even if he signed the form and started speaking to the agents, he could stop answering questions at any time. (Doc. 219 at 43).  Mr. Ilonzo signed the form below the statement, "I have read this statement of my rights and I understand what my rights are.  At this time, I am willing to answer questions without a lawyer present."  (Id. at 44; Gov. Ex. 4). Ilonzo was no longer handcuffed when he signed the form.  (Doc. 219 at 57).

SA Dunn then proceeded to interview Mr. Ilonzo beginning at 3:15 p.m.  (Doc. 219 at 44-45).  At approximately 3:23 p.m., Mr. Ilonzo indicated that he no longer wanted to answer questions and wished to speak with an attorney.  (Id. at 46; Gov. Ex. 4).  At that point, agents did not ask Mr. Ilonzo any more questions.  (Doc. 219 at 46).

Mr. Ilonzo's Post-Arrest Statements in FBI Vehicle

After Mr. Ilonzo invoked his right to counsel, agents re-handcuffed him and placed him in the back of SA Dunn's vehicle to be transported to the Atlanta City Detention Center to be processed. (Doc. 219 at 46). No agent asked Mr. Ilonzo any questions during the ride from the AMARC-Tyrone clinic to the detention center. (Id. at 47-48). During the ride, Mr. Ilonzo made some unsolicited statements. (Id. at 55-56).

Search of Mr. Ilonzo's Rental Car

During their investigation prior to the searches, law enforcement officers had observed Mr. Ilonzo driving a silver Mazda vehicle which officers later determined was a rental vehicle. (Doc. 219 at 85-86). On the day of the search and Mr. Ilonzo's arrest, the Mazda was legally parked in a parking space directly in front of the AMARC-Tyrone clinic. The clinic was located in an office business complex with multiple buildings. (Id. at 100; Def. Exs. 1-2). Task Force Officer Samuel Vickery looked through the untinted windows of the car and could see clearly inside the car. (Doc. 219 at 87). He saw deposit slips for banks that Mr. Ilonzo had visited during the course of the investigation, an iPad, and folders that had characteristics of, and were most likely to be, patient files. (Id. at 87- 88). He believed that the items he

observed inside the vehicle were the types of items that were within the scope of the items authorized to be seized by search warrant.  (Id. at 89).

Vickery conducted the search of Mr. Ilonzo's rental vehicle with the assistance of another officer.  (Doc. 219 at 86, 92).  After Mr. Ilonzo's vehicle was searched, it was towed to the police impound lot. (Id. at 93, 95; Gov. Ex. 2A at 13-9 (Sec. III) and 13-12 (Sec. VI (A)).

Search of Computer at the MCP

The affidavit supporting the application for the search warrant for the MCP described in detail how Mr. Iriele and Ms. Ofume used MCP to purchase and dispense large quantities of controlled substances to customers with prescriptions from the nearby AMARC clinic under suspicious circumstances.  (See Gov. Ex. 6 at ¶¶ 174-196).  The warrant for MCP approved the seizure of, among other items, computers used to facilitate the business.  Agents searched a computer located at MCP while they were onsite at MCP conducting the search.  (Doc. 219 at 214).

Statements by Mr. Iriele

In the afternoon of August 22, 2012, law enforcement officers entered MCP, which was open for business at the time, in order to execute the search warrant. Initially, five officers entered, but throughout the afternoon, approximately eleven

law enforcement officers entered the business to carry out different functions related to the search. (Doc. 285 at 24). Many of the agents were armed, and at least one agent entered the pharmacy with his gun drawn. (Id. at 8, 25, 47-48, 55). After entering the pharmacy, all officers holstered their weapons for the execution of the search warrant. (Id. at 26). One of the agents was wearing a mask because he did undercover work and wanted to hide his identity. (Id. at 6).

The agents announced that they were federal agents and were there to conduct a search warrant. (Doc. 285 at 7, 27). Three pharmacy employees, including Mr. Iriele, were present when officers entered the pharmacy. (Id. at 8, 49). TFO Lawson asked all three employees to sit down and he made sure that they all had chairs. The agents required the employees to remain seated under the supervision of one of the agents while other agents conducted a security sweep of the pharmacy to make sure that no one else was present. (Id. at 30, 51-53, 67-68). Agents asked all three employees for identification. One employee (Ms. Bird) was handcuffed because agents discovered that there was an outstanding warrant for her arrest. (Id. at 9-10). Mr. Iriele was never handcuffed. (Id. at 9, 67).

Approximately thirty to forty minutes after officers entered the pharmacy, at about 3:13 p.m., SA Karnbach and Diversion Investigator Jason Allen began to

17

interview Mr. Iriele.  (See Doc. 285 at 174).  They introduced themselves to Mr. Iriele, and SA Karnbach "made it clear" to Iriele that he was not under arrest, was free to leave, and did not have to answer any questions.  (Id. at 55).  Any weapons were holstered.  (Id. at 56).  The interview lasted approximately an hour.  (Id. at 57). While the search warrant was being executed, Mr. Iriele freely used his phone to make and receive phone calls.  (Id. at 16, 34).  After the interview, Mr. Iriele called his lawyer and said that his attorney would like to speak to the agents, but the agents declined to speak to the lawyer.  (Id. at 35).  At the conclusion of the interview, Mr. Iriele got up, left the room, and the agents brought in Ms. Bird for an interview.  (Id. at 58).  Mr. Iriele was not arrested until over a year later, September 9, 2013.[2]  (Id. at 149-50).

Statements by Ms. Ofume

 On August 22, 2012, around 2:45 p.m., approximately nine law enforcement officers arrived at the Ofume/Iriele residence in order to execute the August 22 search warrant.  Officers loudly knocked or banged on the locked front door of the

---

[2] Iriele also made statements after he was arrested on September 9, 2013.  (Doc. 285 at 149-51, 185-6; Gov. Ex. 1).  Iriele's brief in support of his motion to suppress statements does not contain any argument about these statements.  (Doc. 294).  In any event, I find that Iriele voluntarily made these statements after he was advised of his Miranda rights and waived those rights.

residence two to three times and said "police, search warrant." (Doc. 285 at 85, 107-08).  They also rang the doorbell (which they later learned did not work).  After 25-30 seconds, no one came to the door, and officers heard no noises coming from inside of the house.  (Id. at 85-86, 107-08).  At that point, officers used a battering ram to break the deadbolt and enter the front door.  (Id. at 85-87, 115; Gov. Ex. 3).

Once inside, the agents found Ms. Ofume standing at the top of the stairs. Three of the officers pointed their firearms up the stairs towards Ms. Ofume for a few seconds.  Ms. Ofume was confused, distraught, and alarmed.  The agents commanded her to come down the stairs.  (Doc. 285 at 88-89, 115).

After Ms. Ofume came downstairs, she exited the house at the direction of the agents, with the agents "patting her through."  As she was coming down the stairs and taken outside, Ms. Ofume asked what was going on.  TFO Crutchfield told her that officers had a search warrant for her residence, that they had conducted a lot of search warrants that day, and that the agents would go over that with her in her interview.  The agents asked her if anyone else was in the house, to which Ms. Ofume answered, "no."  (Doc. 285 at 89, 91, 109, 116).

Agents then conducted a security sweep to make sure that no one else was present.  After the agents determined that there was no one else in the home, agents

brought Ms. Ofume back inside the house.  Ms. Ofume had been outside for less than three minutes.  When Ms. Ofume was brought back inside the house, all agents had their firearms holstered.  (Doc. 285 at 91, 93-94, 117).  Ms. Ofume may have been handcuffed briefly before the security sweep.  She was not in handcuffs when she was brought back into the house or at any other time while agents were in her home.  (Id. at 94, 108, 116).

Approximately ten to fifteen minutes after agents entered the home, SA Higgins and DEA Diversion Investigator Green escorted Ms. Ofume to her dining room table to talk with her.  SA Higgins introduced himself to Ms. Ofume and gave her one of his cards.  Diversion Investigator Green, assisted by SA Higgins, proceeded to ask Ms. Ofume questions about her involvement with filling prescriptions from the AMARC clinic.  (Doc. 285 at 117, 129, 131-33).  No agent ever discussed with Ms. Ofume whether she was free to leave the residence.  (Id. at 107).

After Investigator Green had questioned Ms. Ofume for about an hour, SA Higgins advised Ms. Ofume of her Miranda rights.  (Doc. 285 at 134-35).  Ms. Ofume then said that she did not want to answer any more questions, and that she

would like to talk to her attorney.  (Id. at 136).  Neither Green nor Higgins asked Ms. Ofume any more questions.  (Id.).

Agents were in the Ofume/Iriele residence for about ten hours.  They stayed after the initial search was completed because they were obtaining the additional search warrant (the August 23 warrant discussed below) for a computer found in the residence.  (Doc. 285 at 97-98).  During the ten hours, Ms. Ofume was free to move around her home and use her phone to make and receive calls.  (Id. at 99, 102).  At one point, after the Green/Higgins interview, Ms. Ofume handed her phone to TFO Crutchfield and told him that her attorney was on the line.  TFO Crutchfield told the attorney that they had a federal search warrant for the residence, and agents were standing by waiting for another search warrant for a computer found in the home. (Id. at 100, 118).

At some point after the Green/Higgins interview of Ms. Ofume, TFO Crutchfield asked Ms. Ofume for the keys to her vehicles because the vehicles were the subject of seizure warrants.  Ms. Ofume gave Crutchfield the keys, and agents seized the vehicles at the residence pursuant to the seizure warrants.  (Doc. 285 at 97-98).  Sgt. Black, one of the officers in the house, had researched the registered owners of the vehicles and determined that the vehicles were in the names of Ms.

Ofume's children.  Sgt. Black asked Ms. Ofume why her cars were in the name of her children.  Ms. Ofume responded that "they had raised their children and had provided for them for a long time, and it was basically time for them [the children] to start helping them [the parents] out now."  (Id. at 101-02).  Agent Crutchfield knew, from documents he had seen, that Ms. Ofume's children had not bought the cars.  (Id. at 101).

During the ten hours, TFO Crutchfield and Ms. Ofume engaged in conversation unrelated to the investigation.  (Doc. 285 at 98).  During that time, Mr. Iriele, his son, and a pharmacist from the Medicine Center arrived and entered the home.  (Id. at 106).

### The August 23, 2012 warrants for three computers located at the Ilonzo and Ofume/Iriele residences

The original August 22 warrants did not authorize law enforcement to seize or search any computers or electronic devices that might be located at the Ilonzo Residence and the Ofume/Iriele Residence.  (Doc. 219 at 211-12).  While executing the August 22 search warrants at those residences, agents located a Dell Studio Desktop computer (the "Ilonzo desktop") and a Dell Inspiron Laptop computer (the "Ilonzo laptop") in the Ilonzo Residence, (collectively, the "Ilonzo

computers"), (id. at 222; Gov. Exs. 7, 11, 12), and a Powerspec computer in the

Ofume/Iriele Residence (the "Ofume/Iriele desktop"), (Doc. 219 at 222; Gov. Exs. 8,

13).

      In his affidavit for the August 23 search warrants, SA Diller incorporated the

information from the August 22 applications and added additional facts to establish

probable cause for the search and seizure of the computers found in the two

residences.  (Gov. Ex. 7 at SW-000000709-712).  Judge Vineyard issued two

additional search warrants just after midnight on August 23, 2012, for the Ilonzo and

Ofume/Iriele residences for the three computers that were located during the August

22 searches of the residences.  (Doc. 219 at 211-13).  On August 23, 2012, officers

seized the Ilonzo computers and the Ofume/Iriele desktop computer from the

respective residences.  (Id. at 222; Gov. Exs. 7, 8, 11, 12, 13).

      In total, 26 computers and other electronic devices were located and

seized/searched pursuant to the August 22 and August 23, 2012 warrants.  (Doc. 219

at 214). The computer located at MCP was searched and reviewed on-site.  (Id. at

214-15).  For the other 25 devices, DEA either created a forensic image of the device

on-site for later review, or seized the device for later imaging and review.  (Id. at

215).  All 25 devices (forensic images and actual computers) were turned over to a

seizing agent and entered into evidence by DEA in Atlanta.  (Id. at 215-16).  During this time, officers also were processing the large volume of evidence (apart from the computer evidence) that had been seized at the six searched locations.  (Id. at 216). Within two days to a week, agents began shipping devices to DEA computer forensic personnel in Virginia for further imaging and/or review.  (Id. at 210, 217-18).

October 9, 2012 Individual Warrants for 25 Computers and Devices

On October 4, 2012, SA Diller presented U.S. Magistrate Judge E. Clayton Scofield, III with 25 individual search warrant applications for the 25 seized electronic devices (including five computers).  (Doc. 219 at 236). Judge Scofield did not sign the search warrants until October 9, 2012.  (Id. at 220; Gov. Exs. 9-13).

Defendants' Motions To Suppress

Defendants are challenging the seizures and/or searches of the following computers:

1.   A silver MacBook Pro laptop belonging to Ms. Ilonzo, seized at AMARC-Lakewood clinic on August 22, 2012 ("Ms. Ilonzo laptop") (Doc. 219 at 221-22; Gov. Exs. 6, 9);

2.   A Dell laptop belonging to Dr. William Richardson, seized at AMARC-Lakewood clinic on August 22, 2012 ("Dr. Richardson laptop") (Doc. 219 at 222; Gov. Exs. 6, 10);

3.      A black and silver Dell Studio Desktop computer seized at Ilonzo
        Residence on August 23, 2012 ("Ilonzo desktop"); (Doc. 219 at
        222; Gov. Exs. 7, 12);

4.      A black Dell Inspiron Laptop computer seized at Ilonzo
        Residence on August 23, 2012 ("Ilonzo laptop"), (Doc. 219 at
        222; Gov. Exs. 7, 11);

5.      A black Powerspec Desktop computer seized at Ofume/Iriele
        Residence on August 23, 2012 ("Ofume/Iriele desktop) (Doc. 219
        at 222; Gov. Exs. 8, 13); and,

6.      A Dell Inspiron desktop computer located at the MCP.

Ms. Ilonzo and Dr. Richardson claim that their personal computers were seized

outside the scope of the August 22 search warrant.  They allege that the original

August 22 and August 23 warrants did not authorize the search of the seized

computers and that the subsequent October 9 search warrants were invalid because

those warrants were obtained (and the computers were ultimately searched) after an

unreasonable delay.  Mr. Ilonzo is also moving to suppress evidence seized from his

rental vehicle that was parked at the AMARC-Tyrone clinic.

Mr. Iriele and Ms. Ofume claim that agents improperly searched the computer

located at MCP because it exceeded the search warrant's authorization to seize and

search computers used to facilitate the business.

In addition, Defendants Mr. Ilonzo, Mr. Iriele and Ms. Ofume are moving to suppress statements that they made to law enforcement.

Additional facts are discussed in context below.

## II.   DISCUSSION

### A.   The seizure of Dr. Richardson's computer from the AMARC-Lakewood clinic was within the scope of the August 22, 2012 search warrant

Dr. Richardson argues that the agents exceeded the scope of the search warrant for the AMARC-Lakewood clinic because the warrant permitted the seizure of a computer only if it was used to facilitate the business, and at the time the agents seized Dr. Richardson's personal computer, they had no evidence that it was used to facilitate the business.

A search conducted pursuant to a warrant is limited in scope by the terms of the warrant's authorization.  Walter v. United States, 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (plurality).  However, it is often the case that agents have to interpret what they are allowed to seize under the warrant.  Courts have uniformly approved warrants that allow a degree of interpretation by the executing officers.  See  United States v. Betancourt, 734 F.2d 750, 754-55 (11th Cir. 1984) ("The description is considered sufficiently particular when it enables the searcher to

26

reasonably ascertain and identify the things authorized to be seized." (quotation omitted)); United States v. Smith, 918 F.2d 1501, 1507 (11th Cir.1990) (approving a search warrant for "cocaine, documents, letters, photographs, business records, and other evidence relating to narcotics trafficking").  As stated by the Georgia Supreme Court, it "is difficult to imagine that a case could arise where an officer executing a valid search warrant would not at some stage in the matter be required in the very nature of things to exercise his judgment as to what thing or things . . . were to be seized under the warrant."  Strauss v. Stynchcombe, 224 Ga. 859, 866 (1968) (quoted in Wayne R. LaFave, Search and Seizure § 4.11(a), 993 (5th ed. 2012)).

Indeed, the language of the warrant, which Dr. Richardson does not challenge, requires the executing officers to exercise their judgment as to which computers located at the clinic were used to facilitate the business.  Obviously, it was impossible to determine definitively, without offsite analysis, whether any computer on the premises, including Dr. Richardson's computer, had been used to facilitate the business of the clinic.

The issue is whether the agents reasonably could have believed that Dr. Richardson's laptop computer had been used to facilitate the business of the clinic. See Andersen v. Maryland, 427 U.S. 463, 483, 96 S.Ct. 2737, 2749, 49 L.Ed.2d 627

(1976) (concluding that trained special investigators reasonably could have believed that evidence seized pursuant to search warrant fell within the scope of the warrant that allowed the seizure of evidence relating to a particular crime).  Dr. Richardson points out that no one ever observed him using his computer to facilitate the business of the clinic.  Dr. Richardson also emphasizes that when the agents entered the clinic to execute the warrant, he was upstairs in an examination room with a patient, yet his personal computer remained downstairs in his laptop bag with items unrelated to the clinic.  However, direct observation of Dr. Richardson using his computer in connection with his work at the clinic was not necessary.  Other facts allowed the officers to reasonably infer that Dr. Richardson used his computer to facilitate the business of the clinic.

Most importantly, Dr. Richardson brought the computer inside his office at the Lakewood clinic where he was the primary doctor, saw numerous patients,  and prescribed controlled substances.  He also worked at other AMARC clinics and was observed carrying a bag into the other clinics.  Records are necessary in any medical practice, and computers are often used to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules, and other information needed to operate a medical practice.  It was thus reasonable to

assume that Dr. Richardson would keep records relating to his medical practice on the computer that he brought with him into the clinic, and that he would not bring a computer used solely for personal purposes into his office at the clinic.

B.   The seizure of Ms. Ilonzo's computer from the AMARC-Lakewood clinic was within the scope of the August 22, 2012 search warrant

Ms. Ilonzo similarly argues that the agents exceeded the scope of the search warrant when they seized her laptop computer that was located inside her laptop bag at the clinic.  However, as is the case with Dr. Richardson, the agents had a reasonable belief that Ms. Ilonzo's computer was used to facilitate the business of the clinic.

The affidavit in support of the search warrant set forth facts that showed that Ms. Ilonzo had a major role in running the AMARC-Lakewood clinic.  In particular, the affidavit showed that Ms. Ilonzo was a corporate officer who managed the day-to-day activity at the clinic, handed out prescriptions to patients, and collected the proceeds of the clinic.  (Gov. Ex. 6 at  ¶¶ 18, 32, 33, 71-73, 87, 162, 166-173, 179). In addition, testimony at the evidentiary hearing showed that the officers executing the search warrant had a basis for concluding that Ms. Ilonzo was extensively involved in the daily business of the AMARC-Lakewood clinic.  (Doc. 219 at 113,

142-43, 149, 166-67, 199).  Officers located Ms. Ilonzo's laptop computer on a desk that she used in the clinic's front office in a laptop bag that contained multiple other documents relating to the AMARC clinic.  (Id. at 109-10, 112, 113, 138-40, 143-44, 153, 170).  Under these circumstances, the agents had a reasonable belief that the laptop computer found in Ms. Ilonzo's laptop bag was used to facilitate the business of the clinic.

  C. The August 22 and 23 search warrants authorized both the search and seizure of computers; therefore the October 4, 2012 applications were not necessary

  Bona Ilonzo and Dr. Richardson make several arguments that attack the validity of the October 9, 2012 search warrants for five computers issued by Judge Scofield pursuant to October 4, 2012 applications, including the delay in obtaining those search warrants.  (Doc. 260 at 12-14; Doc. 261 at 8-16; Gov. Exs. 9-13).  The government argues that the court need not address these arguments because the August 22 and 23 search warrants authorized both the search and seizure of computers, and therefore the October 4, 2012 applications were not necessary.  (Doc. 278 at 4, 23-27).  I agree with the government's argument that the October 4, 2012 applications and October 9, 2012 search warrants were unnecessary because the

August 2012 warrants already authorized the search and seizure of the computers and other electronic devices.

The August 22 affidavit and warrant had several provisions that made it clear that a search of the content of the computers at the AMARC-Lakewood clinic was sought and authorized. The warrant defined the premises to be searched as the AMARC-Lakewood clinic "as described more fully" in Exhibit A-1 attached to the warrant. (Gov. Ex. 6 at SW-00000003). Exhibit A-1 stated that the premises to be searched "includ[ed] the electronic storage devices found therein." (Id. at SW-00000023). The August 22 warrant also stated that certain property as set forth in attachment Exhibit B-1 was concealed on the premises and that such property constituted evidence of drug trafficking and money laundering offenses. (Id. at SW-00000001). Exhibit B-1 included "computer-generated documents," and computers and other electronic devices "used to facilitate the business." (Id. at SW-00000004-06). The warrant authorized the officers to search and seize the property listed in Exhibit B-1. (Id. at SW-00000001)

Finally, the affidavit for the August 22 warrant included a description of the protocol that would be used in searching the computers. Thus, Magistrate Judge Vineyard knew that by issuing the warrant, he was authorizing the search of the

31

content of the computer and other electronic devices, not just the seizure of the hardware that stored the digital information.

The August 22 warrants that authorized searches of the Ilonzo and Ofume/Iriele Residences did not authorize law enforcement to search and/or seize computers or other electronic devices. (Doc. 219 at 211-212). While executing the August 22 search warrants at those residences, agents located several computers. The agents then prepared additional affidavits and proposed search warrants for those computers. Just after midnight on August 23, those warrants were signed by Judge Vineyard. With respect to each residence, the affidavit of SA Diller attached the previously submitted affidavit for the residence and included a section entitled, "Additional Probable Cause." (Gov. Ex. 7 at SW-0000079; Gov. Ex. 8 at SW-000000834). The additional probable cause consisted of SA Diller's statements that he was present in the Ilonzo and Ofume/Iriele residences executing the warrants that had been issued hours earlier, and he or another agent observed the computers identified in the affidavit and warrant. He then provided facts that can be summarized as follows:

- The Ilonzo desktop computer was next to two printers. Beside one of the printers, agents found documents relating to the finances of various pain clinics;

- The Ilonzo laptop computer was in a laptop bag that contained documents that related to the operation of the AMARC clinics;

- The Ofume/Iriele Computer was observed in the master bedroom of the residence. It was connected to a printer. There was a document next to the computer and printer with indications that it was printed on August 20, 2012. The document was a shipping order for a vehicle to be shipped from College Park, Georgia to Lagos, Nigeria. Financial records were found in the dresser of the bedroom. One document had "11/05/2011" and "enterprise.bankconnect.com" printed at the bottom. The document indicated that two cash deposits ranging from $700,000 to $800,000 (believed to be in Nigerian currency) had been made into a bank account.

SA Diller then provided his opinion that the documents in the Ofume/Iriele bedroom near the computer were evidence of money laundering and the use of proceeds from

illegal prescribing and unlawful distribution of controlled substances. (Gov. Ex. 8 at SW-00000836-37).

As a result of incorporating the earlier affidavit, the August 23 affidavits also included the proposed computer search protocol which indicated that the agents would be examining the information contained within the computer. (See Gov. Ex. 7 at SW-00000709; Gov. Ex. 8 at SW-00000834). The warrants authorized both the seizure and search of the computers. (See id.).

Federal courts have generally not required a second warrant to search a properly seized computer "where the evidence obtained in the search did not exceed the probable cause articulated in the original warrant." See United States v. Evers, 669 F.3d 645, 653 (6th Cir. 2012) (and cases cited therein); see also United States v. Munroe, 421 F.2d 644, 646 (5th Cir. 1970) (holding, more generally, that evidence was validly seized during a search where the evidence was "reasonably related to the offense which formed the basis for the search warrant."). Moreover, where the warrant and accompanying affidavit make clear that the objective of a search includes the contents of a computer, the search of the computer's files does not exceed the warrant. See United States v. Beckett, 369 F. App'x 52, 57 (11th Cir. 2010) (unpublished). Because the searches of the computers here were related to the

34

offenses described in the warrant, no additional warrant was required.  Cf. United States v. Kearns, 2006 WL 2668536, *3-*4 (N.D. Ga. Sep. 15, 2006) (finding, where warrant concerned fraud, agents' cursory search of files contained on computer for evidence of fraud was permissible, and pornographic images discovered during that search were admissible in later child pornography prosecution despite no contemporaneous warrant to search for pornography).  Defendants have not cited to any case that suggests that the court should not follow the general rule that a second warrant was not required to search the contents of their computers.

> D.   Defendants' reliance on case law regarding an unreasonable delay in searching a seized computer is misplaced, as their computers were seized pursuant to a valid warrant

Defendants argue that evidence obtained from the searches of their computers should be suppressed because of an unreasonable delay between the time the computers were seized, and October 9, when search warrants for the computers were obtained.  (Docs. 260-64).  The defendants alleging unreasonable delay rely on United States v. Mitchell, 565 F.3d 1347 (11th Cir. 2009).

In Mitchell, law enforcement agents interviewed Mitchell at his home after identifying him as a possible target in a child pornography investigation.  Id. at 1348-49.  The agents asked Mitchell whether there was child pornography on his

desktop computer, and Mitchell responded, "yes, probably." Id. at 1349. However, he refused to allow the agents to search that computer. The agents did not arrest Mitchell at that time, but seized his desktop computer's hard drive without obtaining Mitchell's consent or a warrant. See id. The agents did not apply for a warrant to search the hard drive until 21 days later. Id.

The Court in Mitchell held that the evidence obtained from the desktop computer should have been suppressed because the agents waited too long before obtaining a search warrant to search the computer. 565 F.3d at 1352. Mitchell does not require suppression in the instant case because, as discussed above, and unlike the situation in Mitchell, the officers here initially obtained the computers pursuant to search warrants.

The initial seizure in Mitchell was justified, despite the lack of a warrant, because of probable cause and a need to ensure that the evidence would not be tampered with or destroyed. See 565 F.3d at 1350. Illustrating the point that the seizure in Mitchell was allowable to temporarily prevent the destruction of evidence pending the issuance of a search warrant, Mitchell cited and quoted from United States v. Martin, 157 F.3d 46 (2d Cir. 1998). Mitchell, 565 F.3d at 1350. In the relevant portion of Martin, the Court found that the police were justified in a

36

warrantless seizure of a package from UPS that had been sent to the defendant where the police had probable cause to believe that the package contained stolen items. Eleven days after the seizure, the police obtained a warrant to search the package. The Martin court held that the seizure of the package pending issuance of a warrant was justified because if it had not been seized there would have been a risk of loss or destruction of suspected contraband. Id. The Mitchell Court also cited United States v. Respress, 9 F.3d 483, 486 (6th Cir. 1993), which similarly upheld the seizure of an item (a suitcase) in order to prevent its disappearance until a warrant could be obtained, and United States v. Mayomi, 873 F.2d 1049 (7th Cir. 1989), which upheld the temporary detention of defendant's mail pending issuance of a search warrant. See Mitchell, 565 F.3d at 1350-51.

Here, unlike the situation in Mitchell and the cases it relied upon, officers did not seize Defendants' computers without a warrant for the purpose of preserving them pending a search warrant. Rather, they obtained warrants before seizing the computers. Thus, Mitchell does not apply. See United States v. Laist, 702 F.3d 608, 613-14 (11th Cir. 2012) (discussing Mitchell as applying where evidence is initially seized without a warrant); see also United States v. Brooks, No. 3:13-CR-58-J-34JRK, 2014 WL 292194, at *15 (M.D. Fla. Jan. 27, 2014) (noting

37

that in <u>Mitchell</u>, agents seized a computer without a warrant and held it for a period of time before eventually obtaining a warrant to search the contents, but finding Mitchell "distinguishable and inapposite" where the agent in that case seized the computers pursuant to a valid search warrant); <u>United States v. Conrad</u>, No. 3:12-CR-134-J-34TEM, 2013 WL 4028273, at *11 (M.D. Fla. Aug. 7, 2013) (finding <u>Mitchell</u> inapplicable where agents seized the defendant's computers pursuant to a valid search warrant).

Moreover, it is relevant that Defendants have not requested the return of their computers.  <u>United States v. Stabile</u>, 633 F.3d 219, 236 (3d Cir. 2011), <u>citing</u> <u>United States v. Johns</u>, 469 U.S. 478, 487, 105 S.Ct. 881, 887, 83 L.Ed.2d 890 (1985) (defendants who "never sought return of the property" cannot argue that delay adversely affected Fourth Amendment rights).  <u>Stabile</u>'s broad statement that a defendant who does not seek the return of property cannot argue a Fourth Amendment violation for this type of delay is not binding.  However, the underlying reasoning of <u>Johns</u>—that failure to seek return of evidence that was properly seized at its outset undermines a later claim that a delay in searching the property had an adverse affect of a legitimate interest—is pertinent here.  <u>See</u> 469 U.S. at 487, 105 S.Ct. at 887.  The Defendants here have not sought the return of their computers, so,

even if the initial seizure of the computers was warrantless, it is not clear that the Defendants could show the requisite adverse affect on their legitimate interests in the computer.

>    E.    The October 9 warrants (to the extent they were necessary) were not improperly obtained through the omission of material facts

Dr. Richardson argues that SA Diller omitted material facts in his affidavit for the October 9, 2012 search warrant for his laptop computer, in violation of Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and its progeny. (Doc. 261 at 8-17).  Specifically, Dr. Richardson contends that the affidavit improperly left out that (1) although federal agents conducted 12 or more undercover "doctor-patient" encounters with Dr. Richardson, no agent ever observed Dr. Richardson using his laptop computer; and (2) there was no direct evidence that Dr. Richardson used his laptop computer in any way related to his work at the AMARC clinics.  He contends that if these facts had been included in the affidavit, Judge Scofield would not have authorized the agents to search Dr. Richardson's personal computer.  (Doc. 261 at 9).

Under Franks, evidence may be suppressed if the underlying search warrant was obtained through misrepresentations or omissions in the affidavit seeking the

warrant.  See United States v. Kapordelis, 569 F.3d 1291, 1309 (11th Cir. 2009).  A defendant seeking suppression under Franks must show that the affiant acted intentionally or with reckless disregard for the truth and that the false statements or omissions were material.  Id.  "[E]ven intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause."  Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997).

The task of a judicial officer from whom a search warrant is requested is simply to make a practical, common sense decision of whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).  Probable cause deals with probabilities not technicalities.  Thus, the judicial officer must consider the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949).  Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and common sense approach should be employed so as to encourage recourse to the

40

warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determinations.  Gates, 462 U.S. 213, 103 S.Ct. 2317; United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994).

Generally, the government need not include exculpatory information in search warrant applications.  See, e.g., Mays v. City of Dayton, 134 F.3d 809, 816 (6th Cir. 1998) (no duty to disclose potentially exculpatory information in search warrant application); United States v. Colkley, 899 F.2d 297, 302-03 (4th Cir. 1990) (no duty to include all potentially exculpatory evidence in affidavit; affirming conviction and ruling that no Franks hearing was required).

The affidavit for the October 8, 2012 search warrant incorporated the August 22, 2012 affidavit.  As set forth above, and applying the applicable standards, the August 22 affidavit provided ample probable cause that the AMARC-Lakewood clinic was an illegal pain clinic engaged in prescribing excessive quantities of controlled substances without a legitimate medical purpose.  The August 22 affidavit also contained the somewhat obvious statement that "Computers are used in medical offices to record patient information, medical records, prescription logs, appointments, billing and payment records, work schedules and other information needed to operate a medical practice."  (Gov. Ex. 6 ¶ 5(q)).  This information,

41

coupled with the new information that a Dell Laptop Computer was one of the

devices seized during the search of the AMARC-Lakewood clinic provided sufficient

probable cause to conclude that the Dell Laptop Computer would contain evidence of

criminal activity.   The fact that Richardson was not directly observed using the

computer during doctor-patient interactions would not undermine the "fair

probability" established by the other evidence in the affidavit.  Accordingly, any

omission in the affidavit was not "material."  See Kapordelis, 569 F.3d at 1309.

> F.    Any delay in completing the forensic searches of the seized computers
>        does not warrant suppression

Some of the Defendants argue that the evidence from the five seized computers

should be suppressed because of the delay in searching the computers after the

October 9, 2012 warrants issued by Judge Scofield.  They argue that Judge Scofield's

warrants (and all search warrants) require the warrants to be executed within 14 days

under Fed.R.Crim.P. 41(e)(2)(A)(i), (Doc. 261 at 15-16;  Doc. 262 at 4; Doc. 263 at

6-8; Doc. 264 at 4), and that the computers were not searched within that time frame.

Rule 41(e)(2)(A)(i) provides that warrants must command officers to execute

the warrant within a specified time no longer than 14 days.  Judge Scofield's

warrants commanded the officers to execute his warrants on or before October 23,

2012.  (Gov. Exs. 9-13).  Yet, law enforcement forensic examiners may have

continued to search some or all of the computers after January 7, 2013.  (Doc. 219 at

268; Gov. Ex. 15 - last page).  However, Rule 41, as amended in 2009, provides that

the fourteen-day limitation does not apply to later off-site copying or review of

electronically stored information:

> **Warrant Seeking Electronically Stored Information.** A warrant under
> Rule 41(e)(2)(A) may authorize the seizure of electronic storage media
> or the seizure or copying of electronically stored information. Unless
> otherwise specified, the warrant authorizes a later review of the media or
> information consistent with the warrant. The time for executing the
> warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site
> copying of the media or information, and not to any later off-site
> copying or review.

Fed.R.Crim.P. 41(e)(2)(B). The Advisory Committee Notes to the 2009 Amendment

to Rule 41(e)(2) explains:

> Computers and other electronic storage media commonly contain such
> large amounts of information that it is often impractical for law
> enforcement to review all of the information during execution of the
> warrant at the search location. This rule acknowledges the need for a
> two-step process: officers may seize or copy the entire storage medium
> and review it later to determine what electronically stored information
> falls within the scope of the warrant.

Fed.R.Crim.P. 41(e) Advisory Committee's Note (2009).

Given the applicable rules and the multi-year complex nature of the

investigation, the delay in the forensic searches of the computers did not violate Rule

41 or the Fourth Amendment.

G.     The *Leon* good faith exception applies to evidence seized from the
          Defendants' computers

The court has reviewed the affidavits for the search warrants challenged in this

case and finds that there was probable cause to believe that evidence of criminal

activity would be found at the searched locations and in the electronic devices found

and seized at those locations.  In any event, this case is also governed by United

States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  In Leon, the

Supreme Court recognized a good faith exception to the exclusionary rule for

searches conducted pursuant to warrants.  The court held that suppression of

evidence would have no deterrent effect when an officer acting with objective good

faith has obtained a search warrant from a judge or magistrate and has acted within

its scope.  Defendants have not convincingly set forth any applicable exception to the

Leon rule.  Accordingly, there is no basis for suppression of the computers that were

seized and searched within the scope of the warrants.  And, as discussed elsewhere in

this Report and Recommendation, the August 22 and 23, 2012 warrants authorized

the seizure and search of the electronic devices specifically listed in the October 9, 2012 search warrants.

> H.   The search of Godfrey Ilonzo's rental car was supported by probable cause and therefore authorized under the automobile exception

Mr. Ilonzo moves to suppress evidence found inside his rental car that was searched while it was legally parked in front of MCP on the day of the search of the pharmacy. The search warrant did not authorize the search of the vehicle. The government argues that the car was lawfully searched under the "automobile exception" to the general search warrant requirement and that the evidence inside the car was lawfully seized pursuant to a valid inventory search. (Doc. 278).

The automobile exception allows the police to conduct a search of a vehicle if (1) the vehicle is readily mobile, and (2) the police have probable cause for the search. United States v. Lindsey, 482 F.3d 1285, 1293 (11th Cir. 2007). "Mobility" is "*inherent* in all automobiles that reasonably appear to be capable of functioning." United States v. Nixon, 918 F.2d 895, 903 (11th Cir. 1990) (emphasis in original). The key issue, therefore, is whether the police had probable cause for the search and seizure of the vehicle. Lindsey, 482 F.3d at 1293. "Probable cause, in turn, exists when under the totality of the circumstances, there is a fair probability that

contraband or evidence of a crime will be found in the vehicle." Id. (quotation omitted).

There is no dispute that Mr. Ilonzo's vehicle was operational and that there was probable cause to believe that evidence of the crime of the illegal dispensing of controlled substances was in the vehicle.[3]  The fact that Mr. Ilonzo was in custody, and that his rental vehicle was lawfully parked in front of the clinic at the time of the search, is not relevant to the application of the automobile exception.  See California v. Carney, 471 U.S. 386, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985) (upholding warrantless search of a motor home parked in a lot after owner taken into custody); United States v. Lisbon, 835 F. Supp 2d 1329, 1366 (N.D. Ga. 2011) (finding it irrelevant to application of automobile exception that defendant was in custody and his vehicle was parked in its designated space in a controlled-access parking facility).

Mr. Ilonzo argues that the automobile exception is not applicable because of limits placed on the automobile exception in Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710, 173 L.Ed.2d 485 (2009).  (Doc. 283).  However, Mr. Ilonzo misconstrues

---

[3] As set forth above, an officer observed, in plain view in the vehicle, documents related to the dispensing of controlled substances and the finances of the clinic.  The magistrate judge who issued the search warrant found that there was probable cause that these types of documents were evidence of the crime of the illegal dispensing of controlled substances and could be seized from the clinic.

<u>Gant</u>.  <u>Gant</u> placed limitations on searches incident to arrest; it did not affect the longstanding law regarding the automobile exception to the search warrant requirement.  <u>See</u> <u>Gant</u>, 556 U.S. 332, 129 S.Ct. 1710; <u>United States v. Alston</u>, ___ Fed. App'x ___, 2015 WL 657854 at *3-*4 (11th Cir. Feb. 17, 2015) (differentiating between the automobile exception, which requires probable cause for a search, and the search incident to arrest exception, which was limited by <u>Gant</u>).  Here, the government is not arguing that the search of Mr. Ilonzo's vehicle was justified as a search incident to arrest.  Instead it is relying on the automobile exception.   Because the car was apparently functioning, and probable cause existed that evidence of the offense was in the car, the government has established the elements of that exception.

Because the automobile exception justified the search, I need not address whether the search was alternatively justified as an inventory search when the car was impounded.

I. <u>Godfrey Ilonzo's statements should not be suppressed because he knowingly, voluntarily, and intelligently waived his privilege against self incrimination</u>

Mr. Ilonzo argues that his statements should be suppressed because the government did not prove that he knowingly and intelligently waived his privilege against self incrimination.  (Doc. 257, at 3-4).

47

The government established that Mr. Ilonzo was advised of his Miranda rights. The court must also determine whether Mr. Ilonzo voluntarily, knowingly, and intelligently waived those rights.  This inquiry is twofold:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (internal quotation marks and citations omitted).  Mr. Ilonzo signed a Miranda waiver form, which is strong proof of a waiver, but not conclusive.  North Carolina v. Butler, 441 U.S. 369, 373, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979).

Mr. Ilonzo contends that he was in an impaired mental state and incapable of recognizing the consequences of his actions.  He points to the strong law enforcement presence and notes that a law enforcement agent stated that he seemed to be in a state of shock.  However, the agent's statement that Mr. Ilonzo appeared to be in a state of shock was not a medical diagnosis.  The agent also said that Mr.

48

Ilonzo did not seem to be in a great deal of distress, had a reasonable demeanor under the circumstances, was alert and coherent, and appeared to understand the advice of rights form and their conversation.  The agent had previously reviewed Mr. Ilonzo's bankruptcy filings that were in Ilonzo's handwriting, which demonstrated that Ilonzo could read and understand English.  (Doc. 219 at 44-45).

As set forth above, at some point, Mr. Ilonzo invoked his rights, and the agents stopped questioning him.  However, Ilonzo later volunteered some statements while he was being transported in a law enforcement vehicle after his arrest.  Ilonzo argues that the government did not present enough evidence about his volunteered statements.  He points out that the government did not introduce into evidence the exact statements that were made during the car ride.  However, it was not necessary for the government to go into the content of the agents' or Ilonzo's statements during the car ride.  The defense had been provided with Agent Dunn's report of Ilonzo's statements, and it is undisputed that the agents did not ask Ilonzo any questions.  In fact, when Ilonzo spoke, one of the agents reminded him that he had invoked his rights and they should not carry on a conversation.  (Doc. 219 at 47-48).  Miranda applies only to statements given in response to questioning or its functional equivalent.  Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297

(1980).  While Ilonzo disputes the accuracy of the agent's report of his statements, any dispute about the accuracy of the report or testimony about that report is not the proper subject of a suppression hearing.

In sum, I have conducted the required inquiry and conclude that Mr. Ilonzo initially voluntarily, knowingly, and intelligently waived his <u>Miranda</u> rights.  He subsequently invoked his rights, but any statements that he made after he invoked his rights were not in response to questioning or the functional equivalent.

J.    The search of pharmacy computer was authorized by search warrant

Mr. Iriele and Ms. Ofume do not dispute that the affidavit for the search of MCP  provided probable cause to search the pharmacy for evidence of the criminal dispensing of controlled substances.  Rather, they allege that the affidavit did not provide probable cause that computer evidence would be located at the pharmacy. (Doc. 239).

However, the affidavit had a section  entitled "Computer Use at Medicine Center Pharmacy" that stated that Georgia pharmacy regulations require pharmacies to maintain certain records and allow pharmacies to utilize an automated electronic data system to do so.  (Gov. Ex. 9; Doc. 239-2 at 1).  The affiant also stated that he had spoken with a Georgia Drug and Narcotics (GDN) Agent who informed him that

she and other GDN agents conducted an inspection of MCP and that MCP maintained its prescription records using a computer during a past inspection.  (Doc. 239-2 at 2).  These statements, along with the evidence of the high volume of prescriptions dispensed at MCP, provided probable cause for the Magistrate Judge to conclude that computers would be used to facilitate the business of MCP.

Mr. Iriele and Ms. Ofume also argue that the agents executing the warrant did not have a sufficient basis to conclude that the computer they searched at the pharmacy was used to facilitate the business of MCP.  However, the computer that was searched was behind the counter in the pharmacy, had "post-it" notes on it related to the business of the pharmacy, was on, was plugged into a printer, and was accessible to the Internet when agents entered the pharmacy.  (Doc. 285 at 17-19).  Therefore, it was reasonable for the agents to conclude that the computer was being used to facilitate the business of MCP, and was therefore covered by the search warrant.

K.    Ms. Ofume's Statements

1.    Ms. Ofume's statements to SA Higgins and Investigator Green should not be suppressed because Ofume was not in custody when she made them

Ms. Ofume argues that her August 22, 2012 statements to SA Higgins and Investigator Green should be suppressed because she was in custody and not given Miranda warnings before she was questioned by these law enforcement agents. (Doc. 295 at 3).  The government contends that Ms. Ofume was not in custody and, therefore, not entitled to Miranda warnings.

The well-known general rule is that a person who is arrested and detained must be given Miranda warnings in order for her statements, made in response to interrogation by a law enforcement officer, to be used against her in court.  Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).  Miranda requires, among other things, that an arrestee be advised before questioning that she has the right to remain silent.  Id. at 440, 86 S.Ct. at 1610.  Miranda warnings are required after a person is "taken into custody or otherwise deprived of his freedom of action in any significant way."  See Stansbury v. California, 511 U.S. 318, 322, 114 S.Ct. 1526, 1528, 128 L.Ed.2d 293 (1994).

52

In determining whether a person is in custody, the court's first inquiry is whether, in light of the circumstances, a reasonable person would have felt free to leave.  Howes v. Fields, 565 U.S. ___, ___, 132 S.Ct. 1181, 1189-90, 182 L.Ed.2d 17 (2012).  In making this determination, courts must examine all of the circumstances surrounding the interrogation.  Relevant factors include the location and duration of the questioning, statements made during the interview, whether physical restraints were used, and whether the subject was ultimately released at the conclusion of the interview.  Id.  (citations omitted).  However, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody."  Id. (quotation omitted).  Court must also determine whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda.  Id.

In addition to the factors set forth in Howes, the Eleventh Circuit directs courts also to consider several other factors in determining custody, "including whether the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled."  United States v. Street, 472 F.3d 1298, 1309 (11th Cir.2006) (quotation omitted).  In considering the totality of the circumstances, "[n]o particular fact in the 'custody' analysis is outcome

53

determinative—[the court] simply weigh[s] the totality of the circumstances." United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010).

As an initial matter, I note that law enforcement officers are permitted to detain an individual during a search pursuant to a search warrant. "[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981); see also Muehler v. Mena, 544 U.S. 93, 98, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005). Ms. Ofume was clearly detained at the inception of the search when the officers broke into her home, she was ordered at gunpoint to descend her stairs, and was taken out of her home with some touching by the agents. However, while these facts are relevant to the totality of the circumstances, the court need not determine whether Ms. Ofume was in custody for Miranda purposes during that phase of the search. Cf. United States v. Hamilton, 2012 WL 1029450, *4-*5 (W.D. Ky. 2012)(collecting cases that discuss whether a Summers-detainee may or may not deserve Miranda's protections). The manner in which Ms. Ofume was secured before questioning does not turn her Summers-type detention into an arrest that required Miranda warnings. At the time Ms. Ofume was interviewed, the circumstances had clearly changed.

The situation here was similar to that in <u>United States v. Peck</u>, 17 F. Supp. 3d 1345 (N.D. Ga. 2014).  In <u>Peck</u>, the agents restrained Defendant and drew their weapons during the initial stage of executing a search warrant on Defendant's home. The court stated that if the initial coercive circumstances of search warrant execution had continued, the court might have granted motion to suppress.  However, after Defendant's house had been cleared for danger, the tenor of the search changed, and Defendant and his family were seated in their living room approximately ten minutes later.  The Court ultimately concluded that Defendant had not been subjected to a custodial interrogation.

Unlike the situation in <u>Peck</u>, Ms. Ofume was not told that she could leave, a circumstance that weighs in her favor.  However, the location of the questioning was Ms. Ofume's dining room in her home, a place where she was most likely to feel comfortable and not coerced.  <u>See</u> <u>United States v. Brown</u>, 441 F.3d 1330, 1348 (11th Cir.2006) ("[C]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.").  Because agents had previously explained to Ms. Ofume that they

were there to conduct a search, Ms. Ofume was not kept in restraints,[4] and was allowed to re-enter her home, a reasonable person in her position would not conclude that the she was under arrest.  The interview lasted an hour, which was not particularly long.  See Howes, 565 U.S. at ___, 132 S.Ct. at 1193 (finding that despite interview that lasted between five and seven hours, prisoner was not in custody for Miranda purposes);  United States v. McDowell, 250 F.3d 1354, 1362 (11th Cir. 2001) (finding that four hour questioning during roadside stop was not custodial interrogation).

The interview concerned the AMARC clinic and Ms. Ofume's role in filling prescriptions for the clinic, but there was no indication that the questioning was hostile or accusatory.   Ms. Ofume was not threatened or physically restrained during the interview, and, after the interview, she walked around her house and freely used her cell phone.  While Ms. Ofume's cars were eventually seized, (see Doc. 285 at 97-98), that did not happen until after the initial interview, and there is no indication that Ms. Ofume would have believed she could not leave her house during the

---

[4]Although the evidence is not clear on this point, the court will assume that Ms. Ofume was initially briefly handcuffed.

interview.  After the search had been completed, agents left the house, and Ms. Ofume was not arrested until a year later.

Considering the totality of circumstances, Ms. Ofume was not subjected to the type of highly intrusive coercive atmosphere that may require Miranda warnings even before a formal arrest is made.  See United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004) (finding that defendant was not subjected to custodial interrogation during an investigative stop although weapons were initially drawn when he was detained); see also United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (finding that statements made during a Terry stop were admissible, the court noted that "we have concluded that drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest for Miranda purposes").  Therefore, even though Ms. Ofume was not given Miranda warnings before the interview, her statements to SA Higgins and Investigator Green should not be suppressed.

2.    Even though Ms. Ofume was still not in custody, her statements
made after she was advised of her *Miranda* rights and invoked her
right to counsel should be suppressed

The next question to consider is whether Ms. Ofume's statements in response to questioning, after she was given Miranda warnings and invoked her rights, should be suppressed. The only specific post-Miranda statement brought out at the hearing was Ms. Ofume's statement in response to the question by Sgt. Black as to why the cars at the residence were titled in her children's names. There are several problems with the government's position on the issue of Ms. Ofume's post-Miranda statements.

First, the government relies on the following quote from Tukes v. Dugger, 911 F.2d 508, 515 (11th Cir. 1990): "The requirement that the prisoner's invocation of the right to counsel cause the cessation of questioning stems from the nature of custody. Where the prisoner is not in custody, [such] concerns are not triggered because the non-custodial defendant is free to refuse to answer police questions, free to leave the police station and go home, and free to seek out and consult a lawyer." (Doc. 307 at 15). However, that reasoning is inapplicable to the facts presented here.

In Tukes, police arrived at the petitioner's house investigating a double homicide. Tukes, 911 F.2d at 510. While talking in front of the police, Tukes stated,

58

"I am going to have to get lawyers." Id.  Tukes then voluntarily accompanied police

to the station house, where police read Tukes his Miranda rights.  Id.  Tukes made no

apparent statement at that time that he wished to have counsel.  Id. at 510-11.  During

the course of an interrogation, Tukes consented to the search of his house.  Id.  The

Eleventh Circuit held that an invocation of the right to counsel does not require a

cessation of questioning where the suspect is not in custody.  Id. at 515.  However,

the invocation in that case occurred before the reading of any Miranda warnings.

The Court made clear that distinction mattered, when, later in the Tukes opinion,

albeit in dicta, it stated:

> We feel constrained to address an argument raised by the state at oral
> argument regarding the result of giving Miranda warnings. At the
> stationhouse Tukes was read a waiver of rights form, described as a
> "Standard Miranda Warning Form." **The state contends that because
> Tukes was not in custody when he was read his Miranda warnings,
> had he invoked his right to counsel the police would have been free
> to ignore that invocation. The state's position is without merit.** If the
> state were free to tell a suspect that he had the right to an appointed
> lawyer, but could, while continuing to interrogate, refuse to provide the
> lawyer on the ground that the suspect was not actually in custody, the
> suspect would be led to believe that no request for counsel would be
> honored. The coercive effect of continued interrogation would thus be
> greatly increased because the suspect would believe that the police
> "promises" to provide the suspect's constitutional rights were
> untrustworthy, and that the police would continue to violate those rights
> as they wished, regardless of assurances to the contrary.

Id. at 516 n.11 (emphasis provided).

The case here fits into the hypothetical, and not actual, factual scenario presented in Tukes.  The above passage suggests that the Eleventh Circuit would reject the contention that because Ms. Ofume was not in custody when she was read and invoked her Miranda rights, the agents were free to continue to question her. Had Ms. Ofume asked for counsel while she both (a) was not in custody, and (b) had not been read her Miranda rights, the government's Tukes-based argument would be persuasive.  However, because Ms. Ofume invoked counsel only after Miranda warnings were given, the police could not ignore that invocation, regardless of custodial status.

In addition, the reading of Miranda rights could have supported a reasonable belief by Ms. Ofume that the encounter had evolved into a custodial one.  See Tukes, 911 F.2d at 515 n.10; see also United States v. Bautista, 145 F.3d 1140, 1148 (10th Cir.1998) ("Although giving a Miranda warning does not, in and of itself, convert an otherwise non-custodial interview into a custodial interrogation, it is a factor to be considered by the court."); United States v. Obasa, 15 F.3d 603, 608 (6th Cir. 1994) (holding that police officer knew that Miranda rights are required to be given only to individuals who are in custody, and "[a]lthough giving Miranda warnings to a

60

detainee may not automatically convert a <u>Terry</u> stop into an arrest, it is evidence that the nature of the detention has grown more serious").

Another problem with the government's position is that it has not clarified what post-<u>Miranda</u> statements it intends to use and the circumstances surrounding those statements. Sgt. Black, the questioner about the cars, did not testify at the evidentiary hearing, and his absence makes it difficult for the court to evaluate the totality of the circumstances surrounding his questioning. (<u>See</u> Doc. 285 at119 (witness does not know if Sgt. Black questioned Ms. Ofume before or after her call to her attorney)). While the government refers to "small talk" between Ms. Ofume and the agents, (Doc. 307 at 6), it does not state whether it intends to introduce such "small talk" against her at trial, and, if so, the content and circumstances of these conversations.

For the above, reasons, I recommend that Ms. Ofume's post-<u>Miranda</u> statements be suppressed.

L.   <u>Mr. Iriele was not in custody when he made statements to police</u>

Defendant Iriele argues that the statements he made to law enforcement officers during the search of MCP should be suppressed. He contends that he was in custody and not given <u>Miranda</u> warnings before he talked to the officers.

As set forth above, approximately thirty to forty minutes after officers entered MCP to execute a search warrant, SA Karnbach and a Diversion Investigator began to interview Mr. Iriele.  They introduced themselves to Mr. Iriele, and SA Karnbach made it clear to Mr. Iriele that he was not under arrest, was free to leave, and did not have to answer any questions.  Any weapons were holstered.  The interview lasted approximately an hour.  While the search warrant was being executed, Mr. Iriele freely used his phone to make and receive phone calls. At the conclusion of the interview, Mr. Iriele got up and left the room.  Mr. Iriele was not arrested until over a year later, September 9, 2013.

Applying the standards discussed above with respect to Ms. Ofume's statements, it is clear that Mr. Iriele was not in custody at the time he was interviewed, and that his statements were voluntarily made.  Therefore,  there is no basis to suppress his statements despite the fact that he was not given Miranda warnings.

M.    Godfrey Ilonzo has not demonstrated that any recorded jailhouse phone calls should be suppressed based on attorney-client privilege

Mr. Ilonzo moves to suppress any statements that were made to counsel via a recorded jailhouse telephone conversation.  First, I note that it is not clear that the

government intends to introduce any such statement.  To the extent that it does, Ilonzo acknowledges in his brief, (Doc. 31 at 4), that the circumstances surrounding his motion are materially similar to the motion that I ruled on in United States v. Landers, No. 1:12-cr-88-TWT-GGB, Doc. 58 at 8-13 (Filed Nov. 7, 2012).  Ilonzo did not ask for a hearing on this motion.  Accordingly, I adopt the discussion from that order, and recommend that Ilonzo's motion to suppress statements made over the jailhouse telephones be denied.

> N.   Dr. Askari has not demonstrated that a severance of her trial is warranted

Dr. Askari moves to have her trial severed from her codefendants.  (Doc. 123). However, her motion contains only conclusory allegations of the risk of prejudice. There is a preference in federal courts for defendants who are indicted together to be tried together.  See United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007). In light of that preference, Askari's motion should be denied because she fails to make any specific arguments as to why severance is warranted.  Dr. Askari also makes mention to the possibility of non-identified Bruton violations at trial. (See Doc. 123 at 2).  Without more, I can make no ruling on any potential Bruton violation, and any issue that arises later can be dealt with during trial.

III.   **CONCLUSION**

In light of the above, I **RECOMMEND** that: Godfrey Ilonzo's Motion to

Suppress Telephone Conversations Between an Attorney and His Client, (Doc. 31);

Godfrey Ilonzo's motion to suppress statements, (Doc. 32); Godfrey and Bona

Ilonzo's motion to suppress evidence, (Docs. 108, 116); Godfrey Ilonzo's motion to

suppress evidence seized from rental car, (Doc. 109); Bona and Godfrey Ilonzo's

motion to suppress evidence from computer and personal property, (Docs. 113, 137);

Dr. Richardson's motion to suppress computer evidence, (Docs. 110, 261); Dr.

Askari's Motion to sever, (Doc. 123); Mr. Iriele and Ms. Ofume's motions to

suppress evidence, (Docs. 210, 211, 213, 214, 239, 262, 268, and 269); and Mr.

Iriele's motion to suppress statements, (Doc. 240), be **DENIED**.  I further

**RECOMMEND** that Ms. Ofume's motion to suppress statements, (Doc. 242), be

**GRANTED IN PART**, insofar as any statements made after she was given Miranda

warnings should be suppressed.

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial.  It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 18th day of May, 2015.


GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE